# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5827 | **DATE** | 6/6/2001 |
| **CASE TITLE** | IBJ WHITEHALL BANK & TRUST CO. vs. CORY & ASSOCIATES, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: In the upcoming trial IBJ WhiteHall Bank & Trust Co.'s damages, therefore, are fixed at $20,367,519. The only issues remaining to be tried are those concerning Insurance Brokers Services, Inc.'s liability for the breach of contract (Count V) and the breach of fiduciary duty (Count IV) causes of action. Revised final pretrial order is due 6/11/01. Final pretrial conference is set for 6/13/01 at 2:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | JUN 07 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 01 JUN -6 PM 6: 23 | 6/6/2001 date mailed notice | |
| CG | courtroom deputy's initials | | CG | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IBJ WHITEHALL BANK & TRUST CO., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Judge Ronald A. Guzmán |
| CORY & ASSOCIATES, INC., | ) ) | 97 C 5827 |
| Defendant/Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| INSURANCE BROKERS SERVICE, INC., | ) ) | **DOCKETED** |
| Third-Party Defendant. | ) | JUN 0 7 2001 |

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff IBJ Whitehall Bank & Trust Co. ("IBJW") has sued defendant Cory & Associates, Inc. ("Cory") for its failure to obtain for it sufficient property insurance. Cory, in turn, has sued Insurance Brokers Service, Inc. ("IBS") for negligence, breach of fiduciary duty, negligent misrepresentation, and breach of contract. On the eve of trial, IBJW and Cory entered into a settlement agreement. Subsequent to our *Memorandum Opinion and Order* granting in part and denying in part Insurance Brokers Service, Inc.'s ("IBS") motion to dismiss, the court entertained oral argument from the attorneys regarding the issues which remained to be determined at trial - including, but not limited



to, the scope of the trial regarding damages issues and the reasonableness of Cory's settlement with IBJ Whitehall Bank and Trust Company ("IBJW"). In addition to the questions raised by Cory's settlement regarding damages, IBS also raised several concerns which might properly have been addressed in our *Memorandum Opinion and Order* regarding its motion to dismiss. We address some of those issues here and then move to a consideration and determination of the issues surrounding the reasonableness and effect of Cory's pretrial settlement with IBJW.

## PLEADING AND PROCEDURAL ISSUES REGARDING COUNTS IV AND V

IBS opines that Fed. R. Civ. P. 14 does not permit Cory to assert in its Third-Party Complaint claims for breach of fiduciary duty and breach of contract against IBSI (Counts IV and V). The Court disagrees. Rule 14(a) provides that "a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed. R. Civ. P. 14(a). In this case, Cory alleges that IBS's breach of fiduciary duty and breach of contract caused damages that are the same as the damages Cory would sustain if it was liable to IBJW. Because Cory has alleged that IBS is secondarily liable to Cory and Cory is trying to transfer to IBS the liability asserted against Cory by IBJW, the prerequisites of Rule 14(a) have been met.

## CORY'S INSURER AS SUBROGEE OF CORY'S CLAIMS

Further, IBS asserts that only Cory's professional liability insurer can bring claims against IBS because the settlement agreement between Cory and IBJW provides that Cory's professional liability insurer will pay a portion of the $20,367,519 settlement amount and accordingly Cory's insurer is subrogated to Cory's claims. Under Illinois law, "there are several requirements a potential subrogee . . . must satisfy before it may assert a right of subrogation. One such requirement . . . is that the claim or debt under which the subrogee asserts his rights must have been paid in full." *American Nat'l Bank & Trust Co. of Chicago v. Weyerhaeuser Co.*, 692 F.2d 455, 460 (7th Cir. 1982).

Under the terms of the settlement agreement, Cory's professional liability insurer must pay $4,000,000 (less any sum to which Cory is entitled pursuant to ¶ 5.4 of the settlement agreement) upon settlement with or entry of judgment with respect to IBS or within thirty days of May 18, 2001, whichever is later. Notwithstanding the $4,000,000 payment, Cory's professional liability insurer must pay IBJW $1,000,000 of the $4,000,000 within ninety days after May 18, 2001. In order for its subrogation right to accrue, Cory's professional liability insurer must satisfy the requirement that the $4,000,000.00 under which it asserts its rights was paid in full to Cory. Under the terms of the agreement, such payment will not be made in full until June 18, 2001, until IBJW settles with IBS, or until an entry of judgment with respect to IBS, whichever occurs latest. For all practical purposes, Cory's professional liability insurer's right to

3

subrogation will accrue after the resolution of the instant litigation. Thus, the Court finds without merit IBS's argument that IBJW, as assignee of Cory's claims against IBS, may not seek recovery from IBS in the instant action because only Cory's professional liability insurer may bring such claims.

## OBJECTIONS TO REASONABLENESS OF SETTLEMENT

IBS objects to the reasonableness of the IBJW/Cory settlement and insists that the agreement should not be binding upon it.[1] In IBS' point of view the only effect of such an agreement is to set a "cap" on the damages which IBJW/Cory is allowed to claim. In all other respects the agreement should have no effect and IBJW/Cory must be required to prove its damages at trial. In the alternative IBS argues that the agreement is unreasonable and the court should set the reasonable damages at the amount of $5,167,000.

To require IBJW/Cory to prove Cory is actually liable to IBJW in this situation would place an extremely difficult burden on Cory, or any other defendant/third-party

---

[1] Challenges to such agreements by third party indemnitors have, in previous cases, been raised in a variety of ways. In *WestAmerica Mortgage Co. v. Tri-County Reports, Inc.*, 670 F. Supp. 819 (N.D. Ill. 1987), the third party defendant moved to vacate a similar settlement. In *Native American Arts, Inc. v. Adobe Moon Arts, Inc.*, No. 00 C 5267, 2001 WL 55544 (N.D. Ill. Jan. 18, 2001), the defendant moved to dismiss. In *Platinum Technology, Inc. v. Federal Insurance Co.*, No. 99 C 7378, 2001 WL 109814 (N.D. Ill. Feb. 2, 2001), the defendant filed a motion for summary judgment.

4

plaintiff found in similar circumstances and would all but eliminate the motivation for many such settlements. If Cory also had to prove at trial that it was liable for the full settled amount in order to establish its damages under its breach of contract and equitable fiduciary duty claims, then there would be even less incentive to settle. As the court held in *Vitkus v. Beatrice Co.*, 127 F.3d 936, 944 (10th Cir 1997):

> We agree that it is unclear whether the $10 million allocation to Vitkus of the total $26.5 million settlement accurately reflects his liability in the Silverado debacle. Actual liability, though, is not our guide in evaluating whether a settlement allocation is enforceable. It would be wholly impractical to charge the District Court with trying the Silverado litigation after a successful settlement in order to ascertain Vitkus' and the other settling parties' relative culpabilities.

Also discussing *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 643 N.E.2d 1226 (1st Dist. 1995), the *Vitkus* court stated:

> The *Gypsum* court underscored two important policy considerations in adopting a legal standard that requires courts to examine only the potential exposure of the settling party. First, if actual liability were the applicable standard, settling defendants would be in the "hopelessly untenable position of having to refute liability in the underlying action until the moment of settlement, and then turn about face to prove liability in the insurance action." Second, requiring an insured to prove the case brought against it in order to receive insurance coverage would dissuade the insured from settling the underlying litigation. Faced with the choice of vigorously defending the underlying tort action or settling it without the hope of insurance coverage, the insured would choose the former.

5

*Vitkus*, 127 F.3d at 945.

In addition to being against the court's policy of encouraging settlement, such a holding would be extremely inequitable given the facts in the case at bar where the primary cause of the complaint against Cory is, allegedly at least, the breach of contract and fiduciary duty committed by IBS when it failed to obtain the insurance Cory requested and failed to disclose this fact to Cory at a time and under circumstances in which it had a fiduciary duty to do so. Were this a tort action IBS would undoubtedly be deemed the active tort-feasor and Cory the passive tort-feasor. Such a ruling in many cases would make it much more advantageous for Cory to go to trial than to settle the case against it. At trial, of course, Cory would be faced with two possibilities. It could win or lose. If it won, all its problems would be resolved and it would, of course, be much better off than having settled the case. But, even if it lost, it would still be better off insofar as its own action against IBS for in that case both liability and actual damages would be conclusively established and the road would be clear for it to sue IBS on its breach of contract and fiduciary duty claims. Clearly the benefits of a settlement which did not establish either liability or amount of damages for Cory's claims against IBS would be reduced. In such a case there is no guarantee Cory could recoup any of its losses from IBS. IBS argues that this result is justified because in the case at bar, the insurance policy which it is accused of failing to obtain is one for property damage as opposed to an express policy insuring Cory for its own negligent conduct. We disagree.

6

We fail to see how this distinction makes a substantial difference. The considerations are exactly the same and lead to the same conclusion. Both equity and public policy militate against forcing IBJW to prove Cory's liability and damages in the case against IBS.

Indeed, cases in this district support our view. Commencing with Judge Aspen's well reasoned *Memorandum Opinion and Order* in *WestAmerica Mortgage Co. v. Tri-County Reports, Inc.*:

> An indemnitee who settles without notice to the prospective indemnitor need not prove that it was in fact liable in the principal action, but need prove only that, by settling, he was responding to a reasonable anticipation of personal liability rather than acting as a mere volunteer . . . . Accordingly, we reject Berke and Mavon's argument that they have the right to litigate Tri-County's liability to WestAmerica.

670 F. Supp. 819, 821 (1987) (quotation and citation omitted). This reasoning is especially applicable to the case at bar because the facts are so analogous. The plaintiff, West America, was in the business of making mortgage loans to businesses and individuals. As part of its loan approval process West America requested that Tri-County, a credit investigation Company, prepare reports on the creditworthiness of its applicants. It then relied upon Tri-County's credit reports in determining that the applicants were qualified for the loan. When the applicants subsequently defaulted, West America brought the action against Tri-County alleging that it failed to include in its

7

reports some seven lawsuits and judgments involving the applicants, and that had West America been advised of the lawsuits prior to making the loan, it would not have made the loan. Tri-County, in turn, filed a third party complaint against Trans Union Credit Information Company ("Trans Union") and Berke and Mavon. Tri-County alleged that Berke agreed to procure insurance for Tri-County for errors and omissions coverage to protect it in just such a situation, and that Mavon agreed to issue such a policy. Berke, however, breached its agreement and its duty of reasonable care by obtaining for Tri-County a policy which failed to provide the necessary insurance coverage and by simultaneously assuring Tri-County that the existing policy provided the requested coverage. Mavon allegedly breached its duty of reasonable care by writing a policy which failed to protect Tri-County for errors and omissions. The similarities to the case at bar are obvious. In the case before us Cory alleges that IBS agreed to procure at Cory's request property damage insurance with coverage in the amount of $7.9 million. Corey further alleges that IBS breached its agreement to do so and breached its duty of reasonable care by obtaining for IBJW a policy which failed to provide the necessary insurance, instead providing only $2.5 million of coverage, while at the same time assuring Cory that it had obtained the policy Cory requested.

In the *WestAmerica* case, Tri-County subsequently entered into a settlement agreement with WestAmerica for $325,000 which was to be satisfied by a lump sum

8

payment of $10,000 and by the unconditional assignment of Tri-County's rights and claims against third party defendants Berke and Mavon. This settlement agreement, of course, is structured in almost precisely the same way as the agreement in the case at bar. The cases appear to be on all fours. IBS, however, argues the existence of a distinguishing factor, i.e., that the policy which Berke agreed to obtain for Tri-County was one of indemnification for Tri-County's own negligent misconduct while the policy which IBS agreed to obtain for IBJW/Cory was for indemnification for loss of property. We fail to understand how this can be a meaningful distinguishing factor. In neither case is the lawsuit based upon the failure of the insurer to live up to the terms of the insurance policy actually issued. Rather, it is the insurance broker who is being sued for failure to obtain the appropriate policy in the first place.

Under these circumstances, Judge Aspen found:

> Under Illinois law, Berke and Mavon, if found liable on the third party complaint for indemnity, will be liable for the full amount of Tri-County's settlement, as long as that settlement was made in reasonable anticipation of personal liability and the settled amount was reasonable even if they were not provided with notice of the settlement.

*WestAmerica*, 670 F. Supp. at 821. We agree. To hold otherwise would be to severely restrict the motivation to settle in these types of cases, to place an impossible burden upon Cory/IBJW, and to place IBS in a more advantageous position at the expense of both the innocent plaintiff, IBJW, and the less culpable Cory.

Also supporting this position is the decision of Judge Kocoras in *Native American Arts, Inc. v. Adobe Moon Arts, Inc.*, No. 00 C 5267, 2001 WL 55544 (N.D. Ill. Jan. 18, 2001). In that case Native American Arts filed a lawsuit (the underlying litigation) against JC Penney Co., Inc. alleging that JC Penney violated the Indian Arts and Crafts Act of 1990 by selling goods in a manner that falsely suggests the goods were produced by Indians. JC Penney filed a third party complaint against defendant Adobe Moon Arts. Adobe Moon Arts manufactured the products and supplied the same to JC Penney. The third party complaint included claims of contribution, breach of indemnity contract, breach of express warranty and breach of implied warranty. Subsequently Native American Arts and JC Penney reached a settlement agreement. According to the settlement damages of $1,960,000 were attributable to Adobe Moon Arts' products. JC Penney promised to pay $50,000 as a partial payment of the $1,960,000 settlement amount and also to assign its claims against Adobe Moon Arts Inc. as partial payment of the settlement amount. Native American Arts, as the assignee of JC Penney, then brought a lawsuit against Adobe Moon alleging breach of indemnity contract, breach of express warranty, and breach of implied warranty of merchantability. Adobe Moon first argued that the court lacked subject matter jurisdiction because the amount in controversy did not exceed $75,000. According to Adobe Moon, the law of indemnity limited JC Penney, in whose shoes Native American Arts stood, to reimbursement for actual damages only. Adobe Moon argued that the actual damage to JC Penney was the $50,000 it paid to

Native American Arts pursuant to the settlement and no more. The court held:

> For Adobe Moon to extract the $50,000 payment and ignore the assignment of claims is to distort the settlement agreement. Instead, these claims are separate and distinct from the indemnification claim and, as such, can produce a recovery well in excess of the $75,000 amount in controversy requirement.
>
> . . .
>
> The cases impose third-party liability for the full amount of settlement as long as the settlement was made in reasonable anticipation of personal liability and the settled amount was reasonable even if they were not provided with notice of the settlement.

*Id.*, No. 00 C 5267, 2001 WL 55544, at *2-4 (quotations omitted). Thus, in two factually analogous cases our court has found that the only relevant inquiry is whether the settlement was made in reasonable anticipation of personal liability and whether the amount of the settlement was reasonable. Illinois case law is replete with other cases, which although not factually similar, support this conclusion. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.*, 12 Ill. App. 3d 165, 298 N.E.2d 289 (1st Dist. 1973). For the reasons cited above, IBS' objections are overruled. We turn now to the two-pronged inquiry required by the above-cited cases.

As to the first prong of our inquiry, whether the settlement was made in reasonable anticipation of personal liability, there is no contest. In page one of its *Motion*

11

*of IBSI Objecting to the Reasonableness of IBJ Whitehall and Cory's Settlement Amount*, IBS concedes a reasonable anticipation of personal liability. "Unquestionably, based on Cory's conduct in this transaction, it should have reasonably anticipated liability." Thus, it is beyond dispute that Cory faced a near certain finding of liability at trial.

IBS contests however, whether the settlement amount was reasonable, arguing that $20,367,519 was not a reasonable settlement amount. First, as IBJW points out in its brief, these two factors, likelihood of liability and reasonableness of the settled amount, can not truly be separated. In fact, the one is dependent upon the other. The near certainty that IBJW would have established Cory's liability is directly relevant to the settlement amount issue. The high probability of establishing liability dictates that little, if any, discounting of damages is warranted in the settlement negotiations.

IBS also argues that the limits of the insurance policy, i.e., $7,667,000 is the maximum amount that the insured would ever have received for a total catastrophic insured loss. Of that amount, Travelers, the insurer, promptly paid $2,500,000. The difference between the policy alleged to have been requested and the policy issued is, therefore, $5,167,000. This is a maximum amount on which any settlement should have been based. IBJW counters that there is no general rule against a recovery of consequential damages against insurance brokers. In support of this it cites Lee R. Russ

& Thomas F. Segalia, *Couch on Insurance* § 46:74, at 46--109 to 246--110 (3rd ed. 1996); *National Boulevard Bank v. Brokerage Resources, Inc.*, 62 Ill. App. 3d 159, 378 N.E.2d 1217 (1st Dist. 1978); *Lazzara v. Howard A. Essor, Inc.*, 802 F.2d 260, 270-71 (7th Cir. 1986), and *Scarsdale Villas Assocs, Ltd. v. Korman Assocs. Ins. Agency, Inc.*, 178 Ill. App. 3d 261, 264, 533 N.E.2d 81, 83 (1st Dist. 1988). IBJW also argues that consequential damages against Cory were foreseeable. Both Cory and IBS knew that the insurance was needed in the event of a hurricane or other catastrophic loss, that business interruption coverage was the biggest part of the insurance request, and that, if a hurricane hit, Caribbean Communications Corp. (owner of the facilities) ("CCC") would need the insurance to rebuild its business. Without the insurance monies to do this, lost profits and bankruptcy are obviously foreseeable results. Corey was therefore confronted with near certain liability and damages claims in excess of $58 million.

IBS also argues that CCC chose not to purchase and did not have insurance coverage for damage to transmission and distribution lines and for business interruption which resulted from damage to those transmission and distribution lines. If the transmission and distribution lines are down, a cable company cannot earn any revenue and the transmission and distribution lines are the most costly and time-consuming to rebuild. Any loss of business/profits which resulted from the loss of the transmission and distribution lines or the failure to timely repair the same is therefore not recoverable under

13

the policy. The policy ensures against losses resulting from damage to the insured property only. There was, therefore, no coverage for business interruption and loss of income that resulted from excluded property, specifically damage to the transmission and distribution lines. In order to obtain business interruption coverage the insured must establish the revenue that it lost during the period required to rebuild the insured property minus any avoidable expenses. The insured must prove what period of time was required to restore the insured property using diligence. IBS claims the plaintiff has no evidence to establish this time period. In response IBJW states that it has in fact taken some of these considerations into account and has lowered its settlement demand by $5,238,083 identified in its expert report as the cost of repairing the "Plant". According to IBS this more than compensates as the term "Plant" also included sums for items other than the transmission and distribution lines. IBJW also points out that in recognition of the fact that transmission and distribution line repair work accounted for the bulk of the repairs performed beginning in July 1996, it has agreed to accelerate the end of the business interruption claims to the period from March 31, 1998 to August 31, 1996. This reduced the amount of lost profits from $12,617,499 to $6,276,160. According to IBJW this results in understating the amount of its damages because not all business interruption after August 1996 was attributable to the transmission and distribution lines.

IBJW also points out that it has, as part of its settlement compromise, agreed to

14

eliminate the entire claim preparation fee amount of $370,004. Further, it agreed, for purposes of the settlement, not to ascribe any value to the banks' damages which amount to $26,725,032 and, $10,206,085 if the proceeds from the sale of CCC are applied to the current loan balance. Nor can it be said that IBJW's settlement is truly valued at $20,367,519 because a large portion of this amount is not a certainty, but actually depends upon IBJW's ability to collect on the assigned claims against IBS. Thus, in terms of actual certainty of recovery the settlement is valued at much less. Proof of that is reflected in the fact that since its settlement three of the five causes of action assigned to it have been dismissed.

The arguments go back and forth. What is clear, however, is that the settlement amount is the type of reasonable good faith compromise based upon both the likelihood of recovery and Cory's maximum possible exposure at trial that one would expect in a settlement negotiation of this type. In a case such as this there is, because of the number and complexity of the legal and triable issues, a broad range of what may be considered reasonable. This settlement we find is clearly within the range. Although the law is that IBS is not entitled to notice of an impending settlement, we note that in this case all parties were involved in settlement negotiations prior to the case being set for trial. IBS, based upon its own estimates of its exposure chose not to settle. Ultimately, Cory did so. In doing so it was able to structure the settlement in a manner beneficial to it. So long as

Cory reasonably anticipated liability and the settlement amount was reasonable, given all of the facts and circumstances of the litigation and Cory's financial situation, and we find that they were, IBS cannot now, in effect, second guess Cory's judgment.

## Conclusion

In the upcoming trial IBJW's damages, therefore, are fixed at $20,367,519. The only issues remaining to be tried are those concerning IBS' liability for the breach of contract (Count V) and the breach of fiduciary duty (Count IV) causes of action.

**SO ORDERED**  ENTERED: 6/6/01

*Ronald A. Guzman*
**HON. RONALD A. GUZMAN**
**United States Judge**